## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **EUGENE NYAMBAL,** | ) | |
| **5734 First Street South,** | ) | |
| **Arlington, VA  22204** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. _____** |
| | ) | |
| **HON.  JACOB LEW, in his official** | ) | |
| **capacity as SECRETARY OF THE** | ) | |
| **UNITED STATES TREASURY,** | ) | |
| **1500 Pennsylvania Avenue, NW** | ) | |
| **Washington, DC  20260-0010** | ) | |
| **Defendant.** | ) | |
| | ) | |

## COMPLAINT FOR INJUNCTIVE AND MANDAMUS RELIEF

Plaintiff, EUGENE NYAMBAL, by and through counsel, respectfully requests

that this court issue an order – pursuant to the Administrative Procedure Act ("APA"), 5

U.S.C. §§ 555(b), 706(1), 706(2)(A), 706(2)(C), and 706(2)(D) and the Mandamus and

Venue Act ("Mandamus Act"), 28 U.S.C. § 1361 – directing Defendant to require the

International Monetary Fund ("IMF") to implement best practices for the protection of

whistleblowers from retaliation and to specifically to require the IMF to submit Plaintiff's

complaint for retaliation to an independent adjudicative body.

## INTRODUCTION

1.     Pursuant to Section 7071(c) of the Consolidated Appropriations Act of

2012 ("Appropriations Act"), Defendant "shall seek to ensure" that the IMF is

implementing best practices for the protection of whistleblowers from retaliation,

including access to independent adjudicative bodies.

2.      The United States is both the host of the IMF and its largest shareholder. With 16.7% of voting rights, the United States is the only member country entrusted with a veto power at the Board of the IMF. Defendant oversees the IMF on behalf of American taxpayers. As such, Defendant sits on the IMF's Board of Governors, which is the highest decision-making body of the IMF. Alongside the Secretary of State, Defendant's statutory role is also to ensure that the IMF complies with US laws, or at least does not abuse the sovereign immunity privileges granted to the IMF by the US Government. Defendant appoints the U.S. Executive Director of the IMF to oversee day-to-day operations. In accordance with the IMF's internal rules and Code of Conduct, the U.S. Executive Director has authority to request any investigation pertaining to the IMF's governance, or to make appropriate recommendations to ensure the IMF observes U.S. laws, or does not abuse its immunity privileges.

3.      Plaintiff was subjected to six years of retaliation by the IMF for having raised concerns about a lack of transparency and potential corruption in a West African mining project.  Retaliation took place after the adoption of the whistleblower law in the Appropriations Act even though Plaintiff's case was raised in Congressional hearings in support of the adoption of the whistleblower protection law. Plaintiff sent several letters to Defendants and the US Attorney General to enforce the whistleblower law, but to no avail.

## JURISDICTION AND VENUE

4.      This action is brought pursuant to federal statutory law; therefore, jurisdiction is proper under 28 U.S.C. § 1331.

5.      Venue is proper under 28 U.S.C. § 1391(e)(C) since Defendant is acting in his official capacity as an agent of the United States.

## PARTIES

6.      Plaintiff is a taxpayer and lawful resident of the United States since 1995. He was employed by the IMF until 2009 as Senior Advisor to Executive Director Laurean Rutayisire who represented 24 African countries on the Board of the IMF. Plaintiff had a distinguished career in the field of international economic development. He previously held positions as a Team Leader at the World Bank, and Senior Strategy officer with the International Finance Corporation, earning awards for excellence in both capacities.  He has authored numerous books and articles and is a regular speaker on economic development issues. One of Plaintiff's responsibilities at the IMF was to advise member countries in the course of economic aid negotiations, while safeguarding IMF resources on behalf of shareholders.

7.      Defendant Jacob Lew is the United States Secretary of the Treasury who serves at the pleasure of President Barack Obama.

## FACTUAL BACKGROUND

8.      In 2009, the government of Cameroon sought $60 million in IMF funding for a mining project, in addition to a disbursement of IMF credit. Nyambal concluded that Cameroon was not supplying adequate information to allow for a proper assessment of the project, including the identity of the Cameroonian stakeholders in the mining project. Under the IMF-supported program, the Government of Cameroon did not have the right to use the funds earmarked for poverty reduction for other purposes without the IMF's approval. However, the IMF approved the funding without adequate oversight, and, as

3

predicted by Nyambal, most of the $60 million in funding was eventually misappropriated through a complex money laundering scheme involving Geovic Mining Corp, a Cayman Islands and U.S. firm incorporated in Delaware and in Cameroon. Before engaging in this money laundering scheme, Geovic Mining Corp also took a refundable grant of $240,863 from USTDA to finance the feasibility study of the Nkamouna mining project aimed at "building the world's largest cobalt plant in Cameroon." This grant was never refunded, as Geovic thereafter put in place a fraudulent scheme to siphon the project funds, including using front partners in Cameroon, transferring the bulk of the funds to its Cayman-Islands subsidiary, making payments to foreign officials for "technical assistance", conducting over 8 feasibility studies for the same project between $4 and $10 million each without starting the project and eventually selling the mining concession to a Chinese firm. Geovic eventually acquired mining rights in Colorado, Wyoming, Papua New Guinea and the French Territory of New Caledonia without developing Cameroon's mining project, leaving Cameroonian citizens in a desperate situation. It is important to note that the mining project was supposed to take place in the Eastern part of Cameroon, which is the poorest region of the country. The Mayor of the mining region recently told reporters: "We're totally disappointed because we had put a lot of hope in this project".

9.      On June 25, 2009, a few months after the IMF's approval of funding for the mining project, Nyambal's employment at the IMF was abruptly terminated without notice or explanation by Mr. Rutayisire. Nyambal was immediately denied access to his office and his personal belongings were confiscated. When he eventually re-entered his office three months later all files relating to the Cameroon mining project had been

removed. While conducting his financial transactions at the Credit Union a few weeks later, Mr. Nyambal was assaulted and ejected from the bank in full view of the public by Allied Barton security guards, who provide security to the Credit Union under a commercial contract with the IMF.

10.     From 2009 to 2011, the IMF conducted two investigations into the Cameroon mining project, but refused to share the reports with Nyambal.  The first "independent" investigation was conducted by a team from the Morgan Lewis and Bockius law firm at the request of the Ethics Committee of the IMF's Executive Board. The investigative team never interviewed Nyambal, nor asked him to provide witnesses, before concluding that his allegations were unsubstantiated. The IMF has refused to share the investigative report with Nyambal.

11.     The IMF second investigation, conducted by an internal team spearheaded by former-IMF Director Strauss-Kahn, further attempted to cover up the corruption and retaliation against Nyambal. Upon replacing Mr. Strauss-Kahn, the new IMF Managing Director, Ms. Christine Lagarde endorsed his predecessor's conclusions. Contrary to all evidence provided to the IMF, the investigative team through Mr. Strauss-Kahn and Ms. Lagarde, concluded that Nyambal's allegations were unsubstantiated because: (i) four Cameroon citizens who obviously acted as straw men for Geovic in the deal were actually bona fide due to "their political connections," even though they lacked business or mining acumen (one was a primary school teacher making less than $100 a month, the second was her unemployed husband, third was a  niece of a former Prime Minister, and fourth a former defense official); (ii) the funds transferred to the Cayman-Islands and the Geovic claim of $81 million to the Cameroon Government for alleged pre-operating

expenses, which eventually settled for $31 million with an unreported write-off of $50 million, was a legitimate transaction; and (iii) Geovic was headed by an experienced team, even though Geovic's own financial reports from 2006 to 2014 clearly state that a main project risk was its own lack of experience in the mining sector. In sharp contrast with the Ms. Lagarde's findings, on November 30, 2011, the Government Accountability Project, a leading whistleblower NGO sent a letter from two of the alleged Cameroonian shareholders to Lagarde stating that the mining project was a scam from the start. Since then, Lagarde has refused to respond to any queries concerning the mining corruption case.

12.     Nyambal's concerns over the fraudulent nature of Cameroon's mining project have since materialized. The $60 million approved by the IMF has disappeared, the project was never started. Geovic eventually sold the mining concession to JXTC, a Chinese state-owned conglomerate. Geovic's penny stock, traded at $0.005, and was later delisted from the Toronto Stock Exchange for failure to meet listing requirements and in particular to disclose to stockholders the issuance of promissory notes at 300% interest rate a year to its insider directors. Since then, Geovic is listed only over the counter at the New York Stock Exchange. Geovic stated in its 2013 annual report that the firm could file for bankruptcy anytime. Its annual report for 2014 is yet to be filed with SEC.

13.     In 2012, Congress passed the Appropriations Act, which provides:

The Secretary of the Treasury *shall* seek to ensure that the IMF is implementing best practices for the protection of whistleblowers from retaliation, including best practices for legal burden of proof, access to independent adjudicative bodies, results that eliminate the effects of retaliation, and statutes of limitation for reporting retaliation. (Emphasis added).

U.S. law on international organizations commonly defines external arbitration as a best practice for adjudicative bodies.

14.     On January 19, 2012, the Government Accountability Project (GAP), a leading whistleblower NGO that represented Nyambal in the corruption case against the IMF sent him the following email:

> Please find attached excerpts from the 2012 U.S. Consolidated Appropriations Act, which was just passed into law. The law requires the Secretary of the Treasury to seek to ensure that the IMF is implementing best practices in whistleblower protection, a major advance that will hopefully lead to stronger whistleblower protections at the IMF eventually. Your case helped to bring attention to the need for stronger whistleblower protections at the IMF and helped lead to this language.

15.     Despite Nyambal's multiple requests, the IMF never complied with the 2012 whistleblower law. On the contrary, the IMF further retaliated against him in 2013 by secretly using a security firm to blacklist him at the World Bank, only ten days after this Court challenged the IMF's claim of absolute immunity for the 2009 retaliation against Plaintiff. As a result, Plaintiff was denied access to the World Bank buildings on July 23 and October 9, 2013 and humiliated in the presence of many professional acquaintances. World Bank officials indicated that they were not involved in Nyambal's unlawful blacklisting, as the instructions to blacklist him at the World Bank came from the IMF through the Allied Barton security firm that works for both institutions. The "No Admit" list of the World Bank is maintained for people deemed to represent a security hazard for the World Bank and its staff members. Since leaving the IMF in 2009, Nyambal has never made any threat or attempted to access the IMF buildings although he had worked for the World Bank as a private contractor in 2010 and 2011.

16.     On June 5, 2014, the World Bank formally declined any responsibility in Nyambal's unlawful blacklisting and shared with him the secret memo used by the IMF to place him on its "No Admit List."  However, the World Bank concealed the names of

the senders and recipients of the blacklisting memo "to respect confidentiality of third parties." These blacklisting incidents were reported by the media and are accessible via the internet to Nyambal's children, friends, professional acquaintances and business partners in other countries and international organizations.

17. Despite Nyambal's multiple requests to the IMF Managing Director and Executive Board and the available evidence provided by the World Bank, the IMF has refused to provide any explanation or to investigate these retaliatory actions in accordance with the Fund's Code of Conduct and Harassment Policy which respectively state:

> Any form of retaliation by an Executive Director against an Alternate Executive Director, Senior Advisor, Advisor or assistant to an Executive Director, or against any Fund staff member or other Fund employee, for using any of the channels available to report suspected misconduct or raise ethical concerns, or for participating as a witness in an ethics matter, is itself a form of misconduct under this Code.

The Fund's Policy on Harassment provides:

> [31]:A person who brings a complaint in good faith should not be subjected to retaliation, and adverse action taken against a complainant that appears to stem from the registering of a complaint will be thoroughly investigated.

18. The Code of Conduct of the IMF adopted by the Board of Governors (including the US Secretary of the Treasury) and the Executive Board (including the US Executive Director) also states:

> …IMF officials should ensure that they observe local laws, so as not to be perceived as abusing the privileges and immunities conferred on the Fund and Executive Directors.

19. On July 25, 2014 or exactly one year after the start of Nyambal's unlawful blacklisting and placement on the Bank's "No Admit" list, the World Bank's Vice

President for Human Resources sent Nyambal a letter of apology and a retroactive
notification of his placement on its blacklist by the IMF stating:

> I apologize for any failure on our part to notify you of the restriction and to
> provide you with the opportunity to respond…**You are not on any World
> Bank Group DO NOT ADMIT (DNA) list, and never have been.** By this
> letter, I formally provide you with written notification of your placement on
> the IMF's DNA list, which the WBG honors, and I would ask that you kindly
> respond as to why you believe you should not be placed on the IMF's DNA
> list and/or why the WBG should not honor the IMF's request to reciprocally
> restrict and/or deny you access to the WBG premises.

20.     Nyambal took the following steps to seek justice between 2009 and 2015.
He sent more than five letters to the Secretary of the Treasury alongside a copy of the
2012 whistleblower law to request that he ensure the IMF's compliance with the US law;
however he has never received any feedback. Nyambal also requested that, as the Chief
Law Enforcement Officer of the US Administration, the US Attorney General help
enforce the 2012 whistleblower law. However, he was advised to contact a private
attorney to enforce a law enacted by Congress compelling the Secretary of the Treasury
to ensure that the IMF comply with the law. In January 2014, Nyambal also filed a
complaint with the Securities and Exchange Commission (SEC) requesting an
investigation into potential violations of the U.S. Foreign Corrupt Practices Act and
S.E.C. regulations by Geovic Mining with the IMF's complicity. Despite the
overwhelming evidence, SEC has also failed to investigate this case. Nyambal also filed a
lawsuit against the IMF to seek legal remedies. On June 22, 2015, the US Supreme court
denied Nyambal's certiorari in the case against the IMF and reiterated that under US
laws, the IMF was immune from legal proceedings. At this stage, Nyambal has exhausted
the available channels for relief short of a writ mandamus.

21.     As a direct result of the IMF's retaliation since 2009 and the unwillingness of the Secretary of the Treasury to enforce the 2012 Whistleblower law, Nyambal's career, financial standing, employability and reputation have been destroyed. His young children have been put under unsustainable emotional distress. Nyambal has no income to support his family. Due to his blacklisting, he has been unable to find contracts in the US and has to spend 6-12 months overseas seeking consultancy opportunities without his family.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that this Honorable Court to award:

(a) a writ of mandamus compelling Defendant to comply with the Appropriations Act and require the IMF to implement whistleblower protections, including the convening of an independent adjudication of Plaintiff's complaints;

(b) monetary damages as authorized by law should Defendant fail to timely comply with the Court order;

(c)     any other relief, injunctive or otherwise, as the Court deems just and

equitable including costs and attorneys fees.

Respectfully submitted,


/s/ *John M. Shoreman*

_____

John M. Shoreman
McFADDEN & SHOREMAN
1050 Connecticut Avenue, NW
Suite 500
Washington, D.C.  20036
(202) 772-3188
Fax (202) 204-8610
mstlaw@erols.com